**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,

    v.

JOHN W. FEMENIA, SHAWN C. HEGEDUS,
DANIELLE C. LAURENTI, CORAM REAL
ESTATE HOLDING, INC., GOLDSTAR P.S. INC.,
ROGER A. WILLIAMS, KENNETH M. RABY,
FRANK M. BURGESS, JAMES A. HAYES,
MATTHEW J. MUSANTE, ANTHONY C.
MUSANTE and AARON M. WENS,

          Defendants,

and

KRISTINE LACK and CHRISTINE E. MUSANTE,

          Relief Defendants.

Civil Action No.

3:12-cv-803-GCM

**FIRST AMENDED COMPLAINT**

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

    Plaintiff Securities and Exchange Commission ("Commission") files this First Amended

Complaint ("Complaint") and alleges as follows:

**SUMMARY**

    1.     Beginning as of at least March 2010 and continuing until the date of the filing of

the initial complaint and Motion for Temporary Restraining Order in this action on December 5,

2012, Defendants engaged in a massive, serial insider trading scheme making at least $13 million

in illicit trading profits through the operation of an insider trading ring that traded in advance of the public announcement of least five mergers and acquisitions (collectively, "Business Combinations") based upon material, nonpublic information misappropriated by Defendant John W. Femenia ("Femenia").

2.     In breach of his duty of confidentiality to Wells Fargo Securities, LLC ("Wells Fargo Securities") and its clients, Femenia misappropriated "inside" information about the Business Combinations and supplied or "tipped" it to three personal friends who traded on the inside information themselves:  (a) Defendant Shawn C. Hegedus ("Hegedus"), who traded on the information with his girlfriend Defendant Danielle C. Laurenti ("Laurenti") through two entities they own and control, Defendant Coram Real Estate Holdings, Inc. ("Coram Real Estate") and Defendant GoldStar P.S. Inc. ("GoldStar P.S."); (b) Defendant Matthew J. Musante ("Matthew Musante"); and (c) Defendant Aaron M. Wens ("Wens").

3.     Shortly after receiving the inside information from Femenia, Hegedus tipped the information further to his business colleague, Defendant Roger A. Williams ("Williams") who himself traded on the inside information and who, in turn, further tipped his friends, Defendants Kenneth M. Raby ("Raby"), Frank M. Burgess, Jr. ("Burgess") and James A. Hayes, IV ("Hayes"), all of whom also traded on the inside information (the "Femenia-Hegedus-Williams Chain").

4.     Shortly after receiving the inside information, Matthew Musante also tipped the information further to his father, Defendant Anthony C. Musante ("Anthony Musante") who himself also traded on the inside information in a TD Ameritrade brokerage account jointly held with his wife, Relief Defendant Christine E. Musante ("Christine Musante") (the "Femenia/Hegedus-Musante Chain").

2

5.      As the insider trading scheme progressed, certain of the Defendants began purchasing call options in the underlying securities as well.  A call option is a financial contract between two parties, the buyer and the seller.  The buyer has the right, but not the obligation, to buy an agreed quantity of the stock underlying the option from the seller by a certain time (the expiration date of the option) for a certain price (the strike price).  The buyer pays a fee for its right (the premium, which is generally the difference between the strike price and the trading price of the underlying stock at the time the option is purchased).  The seller of the call option is obligated to sell the underlying stock to the buyer should the buyer so decide.  When the strike price of the call option is below the trading price of the stock underlying the option, the option is said to be "out of the money."  When the price of the underlying stock surpasses the strike price, the option is said to be "in the money."  The buyer purchases a call option in the belief that the price of the underlying stock will rise before the expiration date.

6.      In exchange for the inside information, certain Defendant tippees/traders agreed to pay and ultimately did pay a portion of their illicit trading profits to Femenia, Hegedus and/or Matthew Musante by at least one of the following methods:  (a) electronically transferring money to Coram Real Estate's TD Ameritrade brokerage account; or (b) depositing cash into a Bank of America account controlled by Femenia but in the name of Femenia's girlfriend, Relief Defendant Kristine Lack ("Lack") (collectively with Relief Defendant, Christine Musante, "Relief Defendants").

7.      In addition, nearly all Defendant tippees/traders have withdrawn or transferred to another account some portion of their illicit trading profits from the brokerage accounts in which they engaged in the illegal insider trading.

3

8.    Each of the Defendants has engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. The Commission requests that the Court enjoin Defendants from violating the foregoing securities laws, order Defendants, on a joint and several basis, to disgorge their unlawful profits with prejudgment interest, order the Relief Defendants to disgorge their unjust enrichment with prejudgment interest, impose civil monetary penalties on the Defendants and order such other relief as the Court may deem appropriate.

9.    Unless restrained and enjoined, the Defendants will continue to violate the federal securities laws and attempt to hide and dissipate assets and monies generated by the illegal trading.

10.   Following the filing of the initial Complaint in this matter, the United States Attorney's Office for the Western District of North Carolina unsealed an indictment charging Defendants Femenia, Hegedus and Laurenti with conspiracy to commit insider trading, conspiracy to commit wire fraud, securities fraud, and money laundering. The Bill of Indictment in *United States v. Femenia, et. al.*, Crim. No. 3:12-cr-00386-RJC (W.D.N.C.) further charged Defendants Williams, Raby, Burgess, Hayes, Matthew Musante and Aaron Wens with conspiracy to commit insider trading.

## JURISDICTION AND VENUE

11.   This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u-1 and 78aa]. Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in

connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

12.     Venue is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] as, inter alia, Defendants Burgess and Hayes reside in Charlotte, North Carolina and because certain of the transactions, acts, practices, and courses of business constituting violations of the Exchange Act occurred in the Western District of North Carolina, including but not limited to, Femenia learning of and tipping about three of the Business Combinations while living and working in the Charlotte, North Carolina area, and each of the Defendants illegally tipping or trading with respect to at least one of those three Business Combinations.

13.     Defendants will, unless restrained and enjoined, continue to engage in the acts, practices, transactions, and courses of business alleged in this Complaint, or in acts, practices, transactions and courses of business of similar purport and object.

## **DEFENDANTS**

14.     Femenia, 31, is a resident of New York, New York. Between in or about 2008 or 2009 to May 2012, Femenia lived in the Charlotte, North Carolina area and worked at Wells Fargo Securities's Charlotte, North Carolina office. Between in or about May 2012 through on or about December 5, 2012, Femenia had worked at a Wells Fargo Securities's New York, New York office at 12 East 94th Street. From at least March 2010 through on or about December 5, 2012, Femenia had worked as an associate in the Industrials Investment Banking Group of Wells Fargo Securities. Femenia holds Series 7 and 9 (Registered Investment Banking Representative) securities licenses.

15.     Hegedus, 32, was, upon information and belief, a resident of Mt. Sinai, New York and/or Miami, Florida. From approximately August 2009 to January 2010, Hegedus was

employed by John Thomas Financial, a registered broker-dealer, as a registered representative. From approximately January 2012 to April 30, 2012, Hegedus was employed as a registered representative of Gradient Securities LLC. Hegedus holds a Series 7 securities license. Hegedus is presently a fugitive.

16.     Laurenti, 32, was, upon information and belief, a resident of Mount Sinai, New York and/or Miami, Florida. Laurenti is presently a fugitive.

17.     Coram Real Estate Holding ("Coram Real Estate") was incorporated under the laws of New York in 2006. Coram Real Estate was and is wholly owned and controlled by Hegedus and/or Laurenti.

18.     GoldStar P.S. Inc. ("GoldStar P.S.") is a New York corporation formed in or about May 2011. GoldStar P.S. was and is wholly owned and controlled by Hegedus and/or Laurenti.

19.     Williams, 52, is a resident of Georgetown, South Carolina. Williams also maintained a residence in Waxhaw, North Carolina, which is located within the Western District of North Carolina, during some or all of 2010 when certain of the insider trading in the Business Combinations occurred.

20.     Raby, 50, is a resident of Greer, South Carolina.

21.     Burgess, 43, is a resident of Charlotte, North Carolina.

22.     Hayes, 38, is a resident of Charlotte, North Carolina.

23.     Matthew Musante, 32, is a resident of Miami, Florida. Matthew Musante was employed at Kaufman, Rossin & Co., an accounting firm located in Florida. On February 15, 2011, Matthew Musante filed a voluntary petition for Chapter 7 bankruptcy protection in the United States Bankruptcy Court for the Southern District of Florida, Miami Division, No.

11:13808-RAM claiming, inter alia, approximately $144,000 in unsecured debt obligations. The final decree and discharge in that case occurred on May 26, 2011.

24.    Anthony Musante, 57, is a resident of Melbourne, Florida and was formerly a resident of Suffolk County, New York.

25.    Wens, 32, is a resident of Encinatas, California.

## RELIEF DEFENDANTS

26.    Lack, 31, was, upon information and belief, a resident of New York, New York.

27.    Christine Musante, 57, is a resident of Melbourne, Florida and was formerly a resident of Suffolk County, New York.

## RELEVANT ENTITIES

28.    Wells Fargo & Company (NYSE: WFC) is a nationwide, diversified, community-based financial services company headquartered in San Francisco, California with $1.3 trillion in assets.

29.    Wells Fargo Securities, a Commission-registered broker-dealer, provides, inter alia, investment banking and capital market services for businesses and offers financial and corporate advisory services, private capital and debt placement, underwriting, equity investing, real estate financing, risk management services and structured products.

30.    GENCO Distribution System, Inc. ("GENCO") was a privately-held, third-party logistics provider based in Pittsburgh, Pennsylvania. On July 19, 2010, GENCO and ATC Technology Corporation ("ATC") publicly announced their agreement for GENCO to acquire ATC. Following the completion of that acquisition on or about October 22, 2010, GENCO was renamed GENCO ATC and remains a privately-held company.

31.     ATC (formerly, NASDAQ: ATAC) was a publicly-traded logistics and refurbishment services Delaware corporation with its principal executive offices in Downers Grove, Illinois.  Prior to its acquisition and merger into GENCO, the stock of ATC was traded on the NASDAQ Global Select Market under the symbol "ATAC".  Its securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act.  Following its acquisition by GENCO, ATC was delisted and deregistered with the Commission and is no longer publicly traded.

32.     Rock-Tenn Company (NYSE: RKT) ("Rock-Tenn") was and is a manufacturer of paperboard, containerboard and consumer and corrugated packaging based in Norcross, Georgia. Rock-Tenn's common stock trades on the New York Stock Exchange under the symbol "RKT." On January 23, 2011, Rock-Tenn and Smurfit-Stone Container Corporation ("Smurfit-Stone") publicly announced their agreement for Rock-Tenn to acquire Smurfit-Stone, and Rock-Tenn completed that acquisition on or about May 27, 2011.

33.     Smurfit-Stone (formerly, NYSE: SSCC) was a Delaware corporation based in Creve Coeur, Missouri and Chicago, Illinois that specialized in containerboard and corrugated packaging and paper recycling.  Prior to its acquisition by Rock-Tenn, the stock of Smurfit-Stone was traded on the New York Stock Exchange under the symbol "SSCC", and its options were traded on the Chicago Board Options Exchange.  Its securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act.  Following its acquisition by Rock-Tenn, Smurfit-Stone was delisted and deregistered with the Commission and is no longer publicly traded.

34.     Kirby Corp. (NYSE: KEX) ("Kirby") is a Houston, Texas-based corporation involved in the transportation of petrochemicals, oil, petroleum and agricultural products.

Kirby's common stock trades on the New York Stock Exchange under the symbol ("KEX"). On March 13, 2011, Kirby and K-Sea Transportation Partners L.P. ("K-Sea") publicly announced their agreement for Kirby to acquire K-Sea, and Kirby completed that acquisition on or about July 1, 2011.

35.     K-Sea (formerly, NYSE: KSP) was a Delaware corporation based in East Brunswick, New Jersey involved in the transportation of refined petroleum products. Prior to its acquisition by Kirby, the common stock of K-Sea was traded on the New York Stock Exchange under the symbol "KSP", with its options traded on the American Stock Exchange, the National Stock Exchange, the New York Stock Exchange and the Philadelphia Stock Exchange. Its securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act. Following its acquisition by Kirby, KSP was delisted and deregistered with the Commission and is no longer publicly traded.

36.     Chicago Bridge & Iron Company, N.V. (NYSE: CBI) ("CBI") is a multinational Netherlands company involved in, inter alia, engineering and construction in the energy industry. CBI's common stock trades on the New York Stock Exchange under the symbol ("CBI"). On July 30, 2011, CBI and The Shaw Group Inc. ("Shaw") publicly announced their agreement for CBI to acquire Shaw. On February 13, 2013, CBI finalized its acquisition of Shaw.

37.     Shaw (formerly, NYSE: SHAW) is a Louisiana corporation with its principal executive offices in Baton Rouge, Louisiana. Shaw is a global provider of engineering, construction, technology, fabrication, remediation and support services for clients in the energy, chemicals, environmental, infrastructure and emergency response industries. Its securities are traded on the New York Stock Exchange under the symbol "SHAW" and are registered with the

Commission pursuant to Section 12(b) of the Exchange Act. Following its acquisition by CBI, Shaw was delisted and deregistered with the Commission and is no longer publicly traded.

38.     Ontario Teachers' Pension Plan ("Ontario Teachers") is the largest single-profession pension plan in Canada. An independent organization, it invests the pension fund's assets and administers the pensions of 300,000 active and retired teachers in Ontario." On January 18, 2012, Ontario Teachers and SeaCube Container Leasing Ltd. ("SeaCube") publicly announced their agreement for Ontario Teachers to acquire SeaCube, pursuant to which SeaCube shareholders would receive $23.00 in cash per SeaCube share. On or about April 25, 2013, Ontario Teachers finalized its acquisition of SeaCube.

39.     SeaCube (NYSE: BOX) was a Bermuda corporation with its principal executive offices located in Park Ridge, New Jersey. SeaCube was one of the world's largest container leasing companies. Its securities were traded on the New York Stock Exchange under the symbol "BOX" and were registered with the Commission pursuant to Section 12(b) of the Exchange Act. Following its acquisition by Ontario Teachers, SeaCube was delisted and deregistered with the Commission and is no longer publicly traded.

40.     GoldStar Debt Relief Services, Inc. ("GoldStar Debt Relief") is a New York corporation wholly-owned and controlled by Hegedus and/or Laurenti, which lists its business address in Mount Sinai, New York at the same address as Coram Real Estate.

## STATEMENT OF FACTS

### Relationships Among the Defendants and Relief Defendants

41.     From approximately 1995 through 1999, Femenia resided in Oakdale, New York.

42.     Femenia and Hegedus have been and are long-time personal friends, and attended high school together at some time between in or about 1995 and 1999.

43. Femenia and Wens have been and are personal friends, having attended the U.S. Merchant Marine Academy together between in or about 1999 through 2003.

44. Between in or about 2008 or 2009 to May 2012, Femenia resided in the Charlotte, North Carolina area, moving to New York, New York in or about May 2012.

45. Between in or about 2008 through 2009, Hegedus resided in Matthews, North Carolina, which is located within the Western District of North Carolina and near Charlotte, North Carolina.

46. In February 2008, Hegedus, through his company GoldStar Debt Relief, assisted Femenia in purchasing a $1.1 million dollar home in Waxhaw, North Carolina.

47. In connection with that purchase, Femenia obtained mortgage loans from Bank of America (formerly Countrywide Bank, FSB) totaling $894,000.

48. In obtaining the loans, Femenia, a business school student at the time, represented that he was the "V.P. of Business Development" of GoldStar Debt Relief – a company owned and controlled by Hegedus and/or Laurenti – and that he had a monthly income of $18,350. Hegedus also certified in a letter to Countrywide Bank that Femenia had been employed by GoldStar Debt Relief since May 20, 2004.

49. In connection with a July 2009 mortgage modification request, Femenia submitted copies of pay stubs from GoldStar Debt Relief, as well as a letter signed by Hegedus stating that Femenia had been demoted to a bank manager at GoldStar Debt Relief.

50. Laurenti is the girlfriend of Hegedus and, upon information and belief, presently resides with Hegedus at some undetermined location. Upon information and belief, she also resided with Hegedus in the Charlotte, North Carolina area between in or about 2008 through 2009, and resided with him in the New York, New York and the Miami, Florida areas during

11

some or all of 2010.   Laurenti is or has been an employee of GoldStar Debt Relief, of which

Hegedus is or has been the CEO, and, as set forth in further detail below, Laurenti controls

and/or owns Coram Real Estate and GoldStar P.S. along with Hegedus.

51.    Coram Real Estate is controlled and/or owned by Hegedus and Laurenti.  As

reflected in the account opening documents for Coram Real Estate's TD Ameritrade brokerage

account, Laurenti is the president and Hegedus is the vice president of Coram Real Estate, and

both have trading authority over Coram Real Estate's TD Ameritrade brokerage account.  Coram

Real Estate's address for service of process is located in Mount Sinai, New York, at an address

also associated with Hegedus and Laurenti.

52.    GoldStar P.S. is owned and controlled by Laurenti and/or Hegedus.  As reflected

in the account opening documents for GoldStar P.S.s' TD Ameritrade brokerage account,

Laurenti is the owner of the entity and has trading authority over the account.

53.    Hegedus and Williams are business colleagues, with Hegedus having served as

Williams' broker and/or financial adviser while Hegedus worked with John Thomas Financial

LLC in or about 2009.

54.    Williams and Raby have been and are personal friends.

55.    Williams and Burgess have been and are close personal friends.

56.    Williams and Hayes are personal friends and/or business associates.  In

connection with Hayes' opening of his TD Ameritrade brokerage account in or about July, 30

2010 – the same account in which Hayes engaged in his insider trading – Hayes listed Williams

in his account opening documents as his referral source to TD Ameritrade.

57.    Hayes and Burgess have been and are personal friends.

58.     Matthew Musante is the son of Anthony Musante and Christine Musante. Matthew Musante resided in Miller Place, New York between in or about June 1995 to 2005.

59.     Matthew Musante is a personal friend of Hegedus. Both Matthew Musante and Shawn Hegedus resided in the Miller Place/Port Jefferson Station, New York area between in or about 2001 through 2005. During periods relevant herein, Matthew Musante and Hegedus exchanged multiple telephone calls. On or about March 26, 2010 – when tipping and insider trading in ATC shares was occurring – Matthew Musante transferred $24,000 from his brokerage account to the Hegedus and/or Laurenti-controlled Coram Real Estate brokerage account. That same amount was transferred from the Hegedus and/or Laurenti-controlled Coram Real Estate brokerage account to Matthew Musante's brokerage account on or about May 4, 2010.

60.     Matthew Musante is a personal friend of John Femenia. During periods relevant herein, Matthew Musante and Femenia exchanged several telephone calls.

61.     Anthony Musante is the father of Matthew Musante and husband of Christine Musante.

62.     Christine Musante is the mother of Matthew Musante and wife of Anthony Musante. For all relevant time periods and continuing to the present, Christine Musante has been the joint account holder with Anthony Musante of a TD Ameritrade brokerage account in which Anthony Musante engaged in the insider trading and which presently continues to hold illicit trading profits.

63.     Kristine Lack is the girlfriend of Femenia and, upon information and belief, previously resided with him.

## Wells Fargo Securities' Insider Trading and Confidentiality Policies

64.     For all relevant time periods, Wells Fargo Securities has maintained investment banking supervisory and compliance procedures, applicable to its investment banking personnel, which provide detailed standards of conduct proscribing insider trading. Specifically, the procedures and rules, inter alia, impose a formal obligation to safeguard material, nonpublic and/or confidential information; prohibit the use of "inside" or material, nonpublic information to trade in securities; and prohibit the recommending of securities of an issuer while aware of material, nonpublic information about it.

65.     As of at least March 2010, Femenia was an associate with the Industrials Investment Banking Group at Wells Fargo Securities. In that position, Femenia became aware of and/or had access to highly confidential and material information concerning each of the Business Combinations prior to their public disclosures.

66.     At all relevant times, Wells Fargo Securities' procedures and rules were fully applicable to Femenia, and he was fully aware of them. As a result, Femenia knew, or was reckless in not knowing, that he owed a fiduciary duty to Wells Fargo Securities and its clients to keep confidential and not disclose, personally use, or misappropriate the material, nonpublic information that he learned through or as a result of his employment with Wells Fargo Securities.

## The GENCO-ATC Transaction

### Background

67.     Between in or about November 2009 and July 19, 2010, GENCO and ATC confidentially explored a GENCO acquisition of ATC. In connection therewith, GENCO and ATC entered a confidentiality agreement on December 11, 2009.

68.     In connection with the proposed transaction, Wells Fargo Securities and/or Wells Fargo Bank N.A. anticipated providing and ultimately did provide financing to GENCO.

69.     Certain Wells Fargo employees became aware of the potential GENCO-ATC transaction as early as December 2009.

70.     Sometime between December 2009 and March 2010, Femenia learned about the potential acquisition of ATC – either in the course of his duties as an employee of Wells Fargo Securities or through the misappropriation of such information from a Wells Fargo Securities colleague and/or confidential documents.

71.     On July 19, 2010, at approximately 6:30 a.m., GENCO and ATC publicly announced their acquisition agreement to acquire ATC.

72.     Following the announcement, ATC's closing share price increased by approximately 39 percent over the prior trading day's close (from $17.43 to $24.20).

**The Hegedus-Femenia-Williams Chain Tips and Trades in ATC Securities.**

73.     Prior to March 26, 2010, none of Hegedus, Laurenti, Coram Real Estate, Williams, Raby or Burgess had any history trading in the securities of ATC.

74.     During the communications set forth below and/or other communications, certain Defendants in the Hegedus-Femenia-Williams Chain tipped material, nonpublic information regarding the ATC acquisition, agreed to engage in insider trading based on such information, and/or made arrangements for sharing the illicit trading profits with Femenia and/or Hegedus.

**The Communications and Insider Trading**

75.     On March 26, 2010 at approximately 11:14 a.m., Femenia called Hegedus. The call lasted approximately 6 minutes.

76. On March 26, 2010 at approximately 12:11 p.m., Williams called Hegedus. The call lasted approximately 6 minutes.

77. On March 26, 2010 at approximately 12:24 p.m., Williams made his first trade in ATC securities.

78. Between March 26, 2010 and April 13, 2010, Williams purchased 60,000 shares of ATC. During this period, Williams exchanged frequent phone calls with Hegedus.

79. On March 26, 2010 at approximately 1:05 p.m., Hegedus and/or Laurenti, through their entity, Coram Real Estate, made their first trade in ATC securities.

80. Between March 26, 2010 and June 22, 2010, the brokerage account of Coram Real Estate (controlled by Hegedus and Laurenti) purchased and sold shares of ATC stock and out-of-the money ATC call options. During this period, Hegedus exchanged frequent phone calls with Femenia.

81. Shortly before March 29, 2010, Williams and Burgess, who were and are close personal friends, had phone call(s) and/or meeting(s).

82. On March 29, 2010, Burgess made his first trade in ATC securities, purchasing thousands of shares and call options of ATC between March 29, 2010 and June 22, 2010, but ultimately selling or letting expire all his ATC securities as of July 14, 2010.

83. During this time period, Burgess exchanged frequent phone calls with Williams, including calls exchanged on several of the days that Burgess made trades in the securities of ATC.

84. On April 6, 2010 at approximately 11:28 a.m. and 7:44 p.m., Williams and Raby had two phone calls, with the latter call lasting approximately 18 minutes.

85. On April 7, 2010, Raby made his first trade in ATC securities.

86. Between April 7 and April 21, 2010, Raby purchased 6,000 shares of ATC. During this period, Raby exchanged several phone calls with Williams.

87. Between March 26, 2010 and April 5, 2010, Williams and Hayes, who are personal friends, had communications in which Williams disclosed the inside information about ATC's acquisition to Hayes.

88. On March 29 and April 5, 2010, Hayes made his first trades in ATC, purchasing 2,000 shares.

**The Exercise/Sale of Securities and Transfer, Dissipation and Sharing of Profits**

89. On July 19, 2010 at approximately 6:30 a.m., GENCO and ATC announced their agreement for GENCO to acquire ATC.

90. On July 19, 2010 at approximately 8:41 a.m., Williams called Hegedus for the first of several phone calls that day, including a 10:12 a.m. call lasting approximately 9 minutes and a 12:04 p.m. call lasting approximately 6 minutes.

91. On July 19, 2010 at approximately 9:17 a.m., Femenia called Hegedus for the first of at least eight phone calls between them on that day, including a call at approximately 10:25 a.m. lasting approximately 5 minutes in duration.

92. On July 19, 2010 at approximately 10:40 a.m., Hegedus and/or Laurenti, through their entity Coram Real Estate, began exercising all of the ATC call options in the TD Ameritrade account that they controlled.

93. On July 19, 2010, beginning at approximately 10:40 a.m., Raby sold the ATC shares in his accounts.

94. On July 19, 2010, beginning at approximately 12:27 p.m., Williams sold the ATC securities in his account.

95. On July 19, 2010 at approximately 6:10 p.m., Hegedus called Williams. The call lasted approximately 49 minutes.

96. As a result of Hegedus and/or Laurenti's insider trading in ATC securities through Coram Real Estate, Hegedus and/or Laurenti obtained approximately $17,000 in illicit profits.

97. As a result of his insider trading in ATC securities, Williams obtained approximately $379,000 in illicit profits.

98. As a result of his insider trading in ATC securities, Raby obtained approximately $34,000 in illicit profits.

99. On July 20, 2010, Hayes sold his 2,000 shares of ATC and realized approximately $13,000 in illicit profits.

100. On July 20, 2010, Hegedus and/or Laurenti electronically transferred $179,621 from Coram Real Estate's TD Ameritrade's brokerage account to a Coram Real Estate TD Bank account as payment for the inside information.

101. On July 19, 2010, Williams transferred $150,000 from his TD Ameritrade brokerage account to the Hegedus/Laurenti-controlled Coram Real Estate TD Ameritrade brokerage account.

102. Williams provided the inside information to Burgess, Raby and/or Hayes as a personal gift and/or Burgess and/or Raby and/or Hayes subsequently provided some portion of their illicit profits to Femenia and/or Hegedus and/or Williams.

### Femenia Tips Wens Who Trades on the Inside Information.

103. Prior to May 27, 2010, Wens had no history of trading in ATC.

104. On May 27, 2010 at approximately 12:04 a.m., Femenia called Wens. The call lasted approximately 32 minutes.

105.     During this and/or other communications, Femenia disclosed to Wens material, nonpublic information regarding the confidential, impending acquisition of ATC, and they agreed that Wens would engage in insider trading, and made arrangements for Wens to share a portion of the illicit profits with Femenia.

106.     On May 27, 2010 at approximately 9:31 a.m., Wens made his first purchase of ATC in a TD Ameritrade brokerage account.

107.     Between May 27, 2010 and June 29, 2010, Wens bought thousands of ATC shares. During this time period, Wens exchanged frequent telephone calls with Femenia, including calls often on the same day or the days before the trading in ATC securities.

108.     On July 19, 2010 at 11:08 p.m., after GENCO and ATC had announced the acquisition agreement earlier that day, Femenia called Wens.

109.     On July 20, 2010, Wens sold all of his shares of ATC.

110.     As a result of his insider trading, Wens obtained approximately $23,000 in illicit profits.

111.     Femenia provided the inside information to Wens as a personal gift and/or Wens subsequently provided some portion of his illicit profits back to Femenia.

### The Rock-Tenn and Smurfit-Stone Transaction

#### Background

112.     Beginning no later than November 2010, Rock-Tenn management began considering an acquisition of Smurfit-Stone and, with the assistance of its financial adviser Wells Fargo Securities, prepared financial models with respect to that potential acquisition.

113.     Between November 2010 and January 2011, certain employees of Wells Fargo Securities learned of Rock-Tenn's interest in Smurfit-Stone, and of certain events leading to the

acquisition. The Wells Fargo Securities's employees who were privy to this information included numerous employees in Wells Fargo Securities's Charlotte office and several employees in Wells Fargo Securities's Industrials Investment Banking Group, the same office and group in which Femenia worked.

114.    Between in or about December 2010 and January 2011, Rock-Tenn and Smurfit-Stone confidentially discussed the possibility of a Rock-Tenn acquisition. During this time period, Femenia learned about Rock-Tenn's potential acquisition of Smurfit-Stone, either in the course of his duties as an employee of Wells Fargo Securities or through the misappropriation of such information from a Wells Fargo Securities colleague and/or confidential documents.

115.    On January 23, 2011 at approximately 7:53 p.m., Rock-Tenn and Smurfit-Stone announced their agreement for Rock-Tenn to acquire Smurfit-Stone.

116.    On Monday, January 24, 2011, Smurfit-Stone's stock price rose on the news of the acquisition, with its closing share price increasing by approximately 27 percent over the prior business day's closing price (from $30.52 to $35.00).

**The Hegedus-Femenia-Williams Chain Tips and Trades in Smurfit-Stone Securities.**

117.    Prior to January 19, 2011, none of Hegedus, Laurenti, Coram Real Estate, Williams, Raby, Burgess or Hayes had any history of trading in the securities of Smurfit-Stone.

118.    During the communications set forth below and/or other communications, certain Defendants in the Hegedus-Femenia-Williams Chain tipped material, nonpublic information regarding the Smurfit-Stone acquisition, agreed to engage in insider trading based on such information, and/or made arrangements for sharing the illicit trading profits with Femenia and/or Hegedus.

## The Communications and Insider Trading

119. Between January 10, 2011 and January 17, 2011, Femenia and Hegedus had multiple calls with one another, including: (a) a January 10, 2011 call from Femenia to Hegedus lasting approximately 8 minutes, and (b) a January 17, 2011 call from Femenia to Hegedus lasting approximately 6 minutes.

120. On January 15, 2011 at approximately 10:56 a.m., Hegedus called Williams. The call lasted approximately 16 minutes.

121. On January 18, 2011 at approximately 11:42 a.m., Burgess called Williams. The call lasted approximately 17 minutes.

122. On January 18, 2011 at approximately 9:35 p.m., Femenia called Hegedus. The call lasted approximately 22 minutes.

123. On January 19, 2011 at approximately 12:01 a.m., Femenia called Hegedus. The call lasted approximately 11 minutes.

124. On January 19, 2011 at approximately 10:16 a.m., Hegedus and/or Laurenti, through their entity Coram Real Estate, made their first trade in Smurfit-Stone securities, ultimately purchasing hundreds of call options between January 19, 2011 and January 21, 2011.

125. On January 19, 2011 at approximately 10:38 a.m., Hegedus called Williams. The call lasted approximately 12 minutes.

126. On January 19, 2011 at approximately 10:52 a.m., Hegedus called Raby. The call lasted approximately 2 minutes.

127. On January 19, 2011 at approximately 11:25 a.m., Raby telephoned Williams. The call lasted approximately nine minutes.

128.     On January 19, 2011 at approximately 11:38 a.m., Raby made his first ever trade in the securities of Smurfit-Stone.  Between January 19, 2011 and January 21, 2011, Raby purchased hundreds of Smurfit-Stone call options and thousands of shares of Smurfit-Stone stock.

129.     On January 19, 2011 at approximately 12:33 p.m., Williams called Hayes.  The call lasted approximately 17 minutes.

130.     On January 19, 2011 at approximately 2:19 p.m., Hayes made his first ever trade in the securities of Smurfit-Stone.  Between January 19, 2011 and January 20, 2011, Hayes purchased thousands of shares of Smurfit-Stone.

131.     On January 19, 2011 at approximately 3:53 p.m., Williams made his first ever trade in the securities of Smurfit-Stone.  Between January 19 and January 21, 2011, Williams purchased hundreds of Smurfit-Stone call options and thousands of shares of Smurfit-Stone stock.

132.     On January 21, 2011 at approximately 9:32 a.m., three days after he exchanged a 17-minute phone call with Williams on January 18, 2011, Burgess made his first ever trade in the securities of Smurfit-Stone, purchasing 11,000 shares.

133.     On January 21, 2011 at approximately 9:43 a.m., Burgess called Williams.  The call lasted approximately 10 minutes.

### The Exercise/Sale of Securities and Transfer, Dissipation and Sharing of Profits

134.     On January 23, 2011 at approximately 7:53 p.m., Rock-Tenn and Smurfit-Stone announced their merger agreement.

135.     On January 23, 2011 at approximately 7:55 p.m., Femenia called Hegedus.  The call lasted approximately 4 minutes.

136. On January 23, 2011 at approximately 8:22 p.m., Hegedus called Williams. The call lasted approximately 3 minutes.

137. On January 23, 2011 at approximately 8:26 p.m., Williams called Hayes. The call lasted approximately 3 minutes.

138. On January 23, 2011 at approximately 9:04 p.m., Burgess called Williams. The call lasted approximately 8 minutes.

139. On January 23, 2011 at approximately 9:30 p.m., Raby called Williams. The call lasted approximately 2 minutes.

140. On January 24, 2011, at approximately 8:10 a.m., Burgess began selling his shares of Smurfit-Stone stock, completing the sale of all of shares by February 3, 2011.

141. On January 24, 2011 at approximately 9:33 a.m., Hayes sold all of his Smurfit-Stone stock.

142. On January 24, 2011 beginning at approximately 10:12 a.m., Raby began exercising his Smurfit-Stone call options and selling all of his shares of Smurfit-Stone stock.

143. On January 24, 2011 at approximately 10:12 a.m., Raby called Williams. The call lasted approximately 4 minutes.

144. On January 24, 2011 at approximately 10:37 a.m., Williams sold all of his shares of Smurfit-Stone stock. On February 2, 2011, Williams exercised all of his Smurfit-Stone stock options.

145. Beginning on January 24, 2011 at approximately 10:48 a.m. and continuing through January 26, 2011, Hegedus and/or Laurenti began exercising all of the Smurfit-Stone stock options held in the Coram Real Estate brokerage account.

146. On February 1, 2011 at approximately 9:51 a.m., Raby sold all of his remaining Smurfit-Stone call options.

147. On February 1, 2011 at approximately 5:35 p.m., Raby called Williams. The call lasted approximately 13 minutes.

148. On February 2, 2011, Williams called Hegedus at approximately 11:43 a.m. (approximately 5 minutes) and 2:33 p.m. (approximately 3 minutes).

149. On February 2, 2011, Williams transferred $104,669 from his brokerage account to the Hegedus/Laurenti-controlled brokerage account of Coram Real Estate.

150. As a result of Hegedus and/or Laurenti's insider trading in Smurfit-Stone securities through Coram Real Estate, Hegedus and/or Laurenti obtained approximately $428,000 in illicit profits.

151. As a result of his insider trading in Smurfit-Stone securities, Williams obtained approximately $455, 000 in illicit profits.

152. As a result of his insider trading in Smurfit-Stone securities, Raby obtained approximately $601,000 in illicit profits.

153. As a result of his insider trading in Smurfit-Stone securities, Burgess obtained approximately $86,000 in illicit profits.

154. As a result of his insider trading in Smurfit-Stone securities, Hayes obtained approximately $19,000 in illicit profits.

155. Between January 24, 2011 and February 4, 2011, Hegedus and/or Laurenti electronically transferred a total of $594,950 from Coram Real Estate's TD Ameritrade brokerage account to Coram Real Estate's TD Bank account.

156.    On February 2, 2010, Williams transferred $104,669 from his TD Ameritrade brokerage account to the Hegedus/Laurenti-controlled Coram Real Estate TD Ameritrade brokerage account as payment for the inside information.

157.    Hegedus and Williams provided the inside information to Raby as a personal gift and/or Raby subsequently provided some portion of his illicit profits to Femenia, Hegedus and/or Williams for the inside information.

158.    Williams provided the inside information to Burgess and Hayes as a personal gift and/or Burgess and/or Hayes subsequently provided some portion of their illicit profits to Femenia, Hegedus and/or Williams for the inside information.

## The Femenia/Hegedus-Musante Chain Tips and Trades in Smurfit-Stone Securities

159.    Prior to January 21, 2011, Anthony Musante had no history of trading in the securities of Smurfit-Stone.

160.    During the communications set forth below and/or other communications, certain Defendants in the Femenia/Hegedus-Musante Chain tipped material nonpublic information regarding Rock-Tenn's merger acquisition of Smurfit-Stone, agreed to engage in insider trading based on such information, and/or made arrangements for sharing the illicit trading profits with Femenia and/or Hegedus.

### The Communications and Insider Trading

161.    On January 21, 2011, Hegedus called Matthew Musante at approximately 12:01 a.m. (approximately 2 minutes in duration), 12:03 a.m. (approximately 5 minutes in duration), 12:09 a.m. (approximately 1 minute in duration), and 12:11 a.m. (approximately 1 minute in duration).

162.     On January 21, 2011 at approximately 8:30 a.m., Matthew Musante called Anthony Musante.  The call lasted approximately 10 minutes.

163.     On January 21, 2011 at approximately 9:34 a.m., Anthony Musante made his first ever trade in Smurfit-Stone in the account he held jointly with Christine Musante, ultimately purchasing 1,400 shares.

### The Exercise/Sale of Securities and Realization of Profits

164.     On January 23, 2011 at approximately 7:53 a.m., Smurfit-Stone and Rock-Tenn jointly announced their merger agreement.

165.     On January 23, 2011 at approximately 9:14 a.m., Anthony Musante sold all of the Smurfit-Stone shares in the account jointly held with Christine Musante.

166.     As a result of Anthony Musante's insider trading in Smurfit-Stone securities, Anthony Musante and Christine Musante obtained approximately $11,000 in profits in their jointly held brokerage account.

167.     Matthew Musante provided the inside information to Anthony Musante as a personal gift and/or Anthony Musante subsequently provided some portion of his illicit profits to Femenia, Hegedus and/or Matthew Musante for the inside information.

### The Kirby and K-Sea Transaction

### Background

168.     Prior to November 3, 2010, Kirby and K-Sea had discussions concerning the possibility of Kirby's acquisition of K-Sea.

169.     On or about November 3, 2010, Wells Fargo Securities approached Kirby about the possibility of resuming discussions regarding its acquisition of K-Sea.

170. Beginning in or about November 2010, Kirby resumed its discussions with K-Sea regarding the possibility of a Kirby acquisition of K-Sea.

171. Wells Fargo Securities acted as Kirby's financial adviser in connection with the potential acquisition of K-Sea.

172. Wells Fargo Securities identified approximately 36 employees in its Charlotte, North Carolina office – the same office in which Femenia worked – who "participated in or were privy to information about the events leading up to the" K-Sea acquisition, prior to the public announcement of its acquisition. Certain Wells Fargo Securities' employees learned about the possible acquisition as early as approximately October 15, 2010.

173. While not specifically identified by Wells Fargo Securities as a person privy to inside information, sometime in October 2010, Femenia learned about the potential acquisition of K-Sea by Kirby – either in the course of his duties as an employee of Wells Fargo Securities or through the misappropriation of such information from a Wells Fargo Securities colleague and/or confidential documents.

174. On March 13, 2011 at approximately 2:00 p.m., Kirby and K-Sea announced that they had entered into an agreement for the acquisition of K-Sea.

175. K-Sea's closing share price on March 13, 2011 increased by approximately 26 percent over the prior day's close following the announcement (from $6.47 to $8.17).

**The Femenia-Hegedus-Williams Chain Tips and Trades in K-Sea Securities.**

176. Prior to October 29, 2010, none of Hegedus, Laurenti, Coram Real Estate, Williams, Raby, Burgess or Hayes had any history of trading in the securities of K-Sea.

177. During the communications set forth below and/or other communications, certain Defendants in the Hegedus-Femenia-Williams Chain tipped material, nonpublic information

27

regarding the Smurfit-Stone acquisition, agreed to engage in insider trading based on such information, and/or made arrangements for sharing the illicit trading profits with Femenia and/or Hegedus.

## The Communications and Insider Trading

178.    From October 20, 2010 through October 28, 2010, Hegedus and Femenia had multiple telephone calls, including: (a) an October 20, 2010 call at approximately 6:22 p.m. lasting approximately 21 minutes, (b) an October 22, 2010 call at approximately 6:46 p.m. lasting approximately 8 minutes, (c) multiple October 23, 2010 calls, (d) an October 25, 2010 call at approximately 5:22 p.m. lasting approximately 10 minutes, (e) an October 26, 2010 call at approximately 6:18 p.m. lasting approximately 6 minutes; and (f) an October 28, 2010 call at approximately 5:42 p.m. lasting that lasted approximately 10 minutes.

179.    On October 23, 2010 at approximately 3:58 p.m. and 4:02 p.m., Raby had two phone calls with Williams, with the calls lasting approximately 1 minute and 9 minutes, respectively.

180.    On October 24, 2010 at approximately 5:38 p.m. and 7:50 p.m., Hegedus and Williams had two telephone calls, with the calls lasting approximately 1 minute and 4 minutes, respectively.

181.    On October 24, 2010 at approximately 8:32 p.m., Williams called Raby.  The call lasted approximately 4 minutes.

182.    On October 25, 2010 at approximately 7:33 a.m., Hegedus called Raby.  The call lasted approximately 4 minutes.

183.    On October 25, 2010, Williams called Hayes at approximately 10:10 a.m., 10:21 a.m., and 10:23 a.m., with each call lasting approximately 1 minute.  At 10:27 a.m., Hayes called Williams for a call lasting approximately 15 minutes.

Case 3:12-cv-00803-GCM   Document 107   Filed 05/22/13   Page 28 of 66

184.     On October 25, 2010 at approximately 11:53 a.m., Raby made his first trade in the securities of K-Sea, ultimately buying and selling hundreds of thousands of K-Sea shares as well as hundreds of call options between October 25, 2010 and February 22, 2011.

185.     On October 25, 2010 at approximately 12:01 p.m., Hegedus called Raby. The call lasted approximately two minutes.

186.     Between October 25, 2010 and February 22, 2011, Raby bought and sold hundreds of thousands of shares of K-Sea stock, as well as out-of-the money call option contracts expiring in June and September 2011. During this time period, Raby exchanged frequent phone calls with Williams, at an average of approximately two phone calls per week, with such calls ranging between 2 minutes and 27 minutes in duration. During this time period, Raby also exchanged several phone calls with Hegedus, with such calls ranging from approximately 1 minute to 17 minutes in duration. As of March 12, 2011, the day before the K-Sea/Kirby merger announcement, Raby held 335,000 shares of K-Sea stock, 205 September 2011 K-Sea call option contracts and 2 June 2011 call option contracts.

187.     On October 25, 2010 at approximately 12:06 p.m., Williams made his first trade in the securities of K-Sea, ultimately purchasing hundreds of thousands of K-Sea shares and hundreds of K-Sea call option contracts between October 25, 2010 and January 6, 2011.

188.     Between October 25, 2010 and January 6, 2011, Williams purchased 244,500 shares of K-Sea stock, as well as out-of-the-money call (and put) options. By January 20, 2011, however, Williams had sold, or allowed to expire, all his K-Sea holdings. During this period, Williams exchanged frequent telephone calls with Hegedus, including calls on several of the days that Williams made trades in the securities of K-Sea.

189.    On October 26, 2010 at approximately 12:19 p.m., Hayes made his first trade in the securities of K-Sea, ultimately purchasing and selling tens of thousands of K-Sea shares between October 26, 2010 and February 16, 2011.

190.    On October 25, 2010 at approximately 12:33 p.m., Williams called Hegedus. The call lasted approximately 1 minute.

191.    On October 25, 2010 at approximately 5:22 p.m., Femenia called Hegedus. The call lasted approximately 10 minutes.

192.    On October 26, 2010 at approximately 6:18 p.m., Femenia called Hegedus. The call lasted approximately 6 minutes.

193.    On October 28, 2010 at approximately 5:42 p.m., Femenia called Hegedus. The call lasted approximately 10 minutes.

194.    On October 29, 2010 at approximately 10:33 a.m., Hegedus and/or Laurenti made their first trade in the securities of K-Sea through their entity Coram Real Estate.

195.    Between November 1, 2010, and February 14, 2011, Coram Real Estate (in the account controlled by Hegedus and Laurenti) continued to buy out-of-the-money call options with increasingly distant expiration dates, selling its previous options holdings in the process. In early November, Coram Real Estate sold its December 2010 call options and purchased 100 K-Sea March 2011 call option contracts. Coram subsequently purchased 200 September 2011 call option contracts (February 11, 2011) and 94 June 2011 call option contracts (February 14, 2011). During this time period, Hegedus exchanged frequent phone calls with Femenia, at an average of approximately three phone calls per week.

196.    On February 5, 2011 at approximately 9:51 a.m., Williams called Burgess. The call lasted approximately 13 minutes.

197. On February 6, 2011 at approximately 5:06 p.m., Hegedus called Williams. The call lasted approximately 3 minutes.

198. On February 8, 2011 at approximately 11:17 a.m., Williams began again purchasing thousands of shares of K-Sea.

199. On February 8, 2011 at approximately 3:46 p.m., Burgess called Williams. The call lasted approximately 35 minutes.

200. On February 9, 2011, Burgess called Williams. The call lasted approximately 3 minutes.

201. On February 10, 2011 at approximately 6:20 p.m., Williams called Burgess. The call lasted approximately 11 minutes.

202. On February 11, 2011 at approximately 9:40 a.m., Burgess made his first trade in the securities of K-Sea, ultimately purchasing and selling tens of thousands of shares and call options between February 11 and March 9, 2011.

203. Between February 11, 2011 and March 9, 2011, Burgess purchased and sold thousands of shares of K-Sea stock and hundreds of K-Sea call options. During this period, Burgess exchanged several phone calls with Williams, at a rate of approximately three calls per week, with such calls ranging in duration from approximately 1 minute to 57 minutes.

**The Exercise/Sale of Securities and Transfer, Dissipation and Sharing of Profits**

204. On March 13, 2011 at approximately 2:00 p.m., Kirby and K-Sea announced their agreement for Kirby to acquire K-Sea.

205. On March 13, 2011 at approximately 6:46 p.m., Williams called Hegedus. The call lasted approximately 11 minutes.

Case 3:12-cv-00803-GCM   Document 107   Filed 05/22/13   Page 31 of 66

206.    On March 13, 2011 at approximately 6:57 p.m., Williams called Burgess. The call lasted approximately 14 minutes.

207.    On March 13, 2011 at approximately 7:11 p.m., Williams called Hayes, and Hayes returned the call to Williams at 7:26 p.m. The latter call lasted approximately 18 minutes.

208.    On March 13, 2011 at approximately 7:12 p.m., Williams called Raby. The call lasted approximately 1 minute.

209.    On March 14, 2011 at approximately 9:16 a.m., Burgess began selling all of his shares in K-Sea.

210.    On March 14, 2011 at approximately 9:58 a.m., Raby called Williams. The call lasted approximately 27 minutes.

211.    On March 14, 2011 at approximately 11:12 a.m., Williams began selling all of his K-Sea holdings, ultimately selling all of his K-Sea shares between March 14, 2011 and March 17, 2011.

212.    On March 14, 2011 at approximately 11:52 a.m., Williams called Hegedus. The call lasted approximately 4 minutes.

213.    On March 14, 2011 at approximately 12:09 p.m., Hegedus and/or Laurenti, through their entity Coram Real Estate, began exercising all of their K-Sea call options.

214.    On March 14, 2011 at approximately 12:22 p.m., Raby began selling all of his K-Sea shares and exercising all of his K-Sea options.

215.    On March 14, 2011 at approximately 3:46 p.m., Femenia called Hegedus. The call lasted approximately 4 minutes.

216.    On March 17, 2011 at approximately 12:22 p.m., Williams called Hayes. The call lasted approximately 12 minutes.

217.    On March 17, 2011 at approximately 2:25 p.m., Williams called Hayes.  The call lasted approximately 17 minutes.

218.    On March 18, 2011, Hayes began selling all of his K-Sea stock.

219.    On March 21, 2011, Hegedus and Raby had two phone calls at approximately 11:15 a.m. and 11:20 a.m., with the latter call lasting approximately 14 minutes.

220.    On March 22, 2011 at approximately 10:02 a.m., Raby called Williams.  The call lasted approximately 10 minutes.

221.    As a result of their insider trading in K-Sea securities, Hegedus and/or Laurenti, through Coram Real Estate, obtained approximately $57,000 in illicit profits.

222.    As a result of his insider trading in K-Sea securities, Williams obtained approximately $750,000 in illicit profits.

223.    As a result of his insider trading in K-Sea securities, Raby obtained approximately $687,000 in illicit profits.

224.    As a result of his insider trading in K-Sea securities, Burgess obtained approximately $88,000 in illicit profits.

225.    As a result of his insider trading in K-Sea securities, Hayes obtained approximately $49,000 in illicit profits.

226.    Between March 15, 2012 and March 24, 2011, Hegedus and/or Laurenti electronically transferred a total of $89,000 from Coram Real Estate's TD Ameritrade brokerage account to TD Bank account in the name of Coram Real Estate account as payment for the inside information.

227.    Between March 22, 2011 and March 24, 2011, Raby electronically transferred a total of approximately $94,000 from his brokerage account to an outside checking account

owned and/or controlled by him. Between April 11, 2011 and April 14, 2011, Raby electronically transferred approximately $400,000 from his brokerage account to that same outside checking account.

228.    On March 28, 2011, Williams transferred $114,800 from his TD Ameritrade brokerage account to the Hegedus/Laurenti-controlled Coram Real Estate TD Ameritrade brokerage account as payment for the inside information.

229.    Hegedus and Williams provided the inside information to Raby as a personal gift and/or Raby subsequently provided some portion of his illicit profits to Femenia, Hegedus and/or Williams for the inside information.

230.    Williams provided the inside information to Hayes and Burgess as a personal gift and/or Hayes and/or Burgess subsequently provided some portion of their illicit profits to Femenia, Hegedus and/or Williams for the inside information.

### The Femenia/Hegedus-Musante Chain Tips and Trades in K-Sea Securities

231.    Prior to December 29, 2010, none of Matthew, Anthony or Christine Musante had any history of trading in the securities of K-Sea.

232.    During the communications set forth below and/or other communications, certain Defendants in the Femenia/Hegedus-Musante Chain tipped material, nonpublic information regarding the K-Sea acquisition, agreed to engage in insider trading based on such information, and/or made arrangements for sharing the illicit trading profits with Femenia, Hegedus and/or Matthew Musante.

### The Communications and Insider Trading

233.    On December 22, 2010 at approximately 10:35 a.m., Hegedus called Matthew Musante. The call lasted approximately 3 minutes.

234. On December 22, 2010 at approximately 6:45 p.m., Matthew Musante called Hegedus. The call lasted approximately 25 minutes.

235. On December 24, 2010 at approximately 12:03 p.m., Matthew Musante called Anthony Musante. The call lasted approximately 5 minutes.

236. Between December 27 and December 29, 2010, Hegedus and Matthew Musante had multiple phone calls, including: (a) a December 27, 2010 call at approximately 12:27 p.m. from Matthew Musante to Hegedus lasting approximately 20 minutes, (b) a December 28, 2011 call at approximately 5:56 p.m. from Hegedus to Matthew Musante lasting approximately 10 minutes, and (c) multiple calls on December 29, 2011.

237. On December 29, 2010 at approximately 3:56 p.m., Anthony Musante made his first trade in the securities of K-Sea, ultimately purchasing and selling numerous K-Sea shares and call options between December 29, 2010 and March 11, 2011.

238. During this same time period (between December 29, 2010 and March 11, 2011), Matthew Musante had multiple telephone calls with Hegedus, and Matthew Musante had multiple phone calls with Anthony Musante, including calls often on the same days or the days prior to Anthony Musante making trades in the securities of K-Sea.

### The Exercise/Sale of Securities and Realization of Profits

239. On March 13, 2011 at approximately 2:00 p.m., K-Sea announced its merger agreement with Kirby.

240. On March 14, 2011 at approximately 8:11 a.m. and 9:35 a.m., Matthew Musante had two telephone calls with Anthony Musante, with the calls lasting approximately 1 minute and 18 minutes, respectively.

241.    On March 14, 2011 at approximately 9:27 a.m., Anthony Musante began selling and/or exercising all of his the K-Sea securities in the TD Ameritrade account jointly held with Christine Musante.

242.    As a result of Anthony Musante's insider trading, Anthony Musante and Christine Musante obtained approximately $78,000 in illicit profits.

243.    Matthew Musante provided the inside information to Anthony Musante as a personal gift and/or Anthony Musante subsequently provided some portion of his illicit profits to Femenia, Hegedus and/or Matthew Musante for the inside information.

### The CBI/Shaw Transaction

### Background

244.    On July 3, 2012, CBI contacted two Managing Directors at Wells Fargo Securities regarding Wells Fargo Securities's possible participation in the financing of a CBI acquisition of Shaw.  On that same day, at least 14 additional Wells Fargo Securities employees were alerted to CBI's potential acquisition of Shaw, including four employees in Wells Fargo Securities's New York office located at 12 East 94th Street, New York, New York.

245.    Beginning on or about May 2012 and continuing until on or about December 5, 2012, Femenia had worked at the Wells Fargo Securities's New York office at 12 East 94th Street, New York, New York.

246.    By no later than on or about July 5, 2012, Femenia had learned about CBI's potential acquisition of Shaw – either in the course of his duties as an employee of Wells Fargo Securities or through the misappropriation of such information from a Wells Fargo Securities colleague and/or confidential documents.

247. On July 30, 2012 at approximately 7:41 a.m., CBI and Shaw announced their agreement for the acquisition of Shaw.

248. Following the announcement, Shaw's stock price increased approximately 64 percent from a closing price of $26.69 on July 27, 2012 to an opening price the next business day (July 30, 2012) of $43.68.

### The Femenia-Hegedus-Williams Chain Tips and Trades in Shaw Securities.

249. Prior to July 13, 2012, none of Hegedus, Laurenti, Coram Real Estate, GoldStar P.S., Williams, Raby, Burgess, or Hayes had any history of trading in the securities of Shaw.

250. During the communications set forth below and/or other communications, certain Defendants in the Hegedus-Femenia-Williams Chain tipped material, nonpublic information regarding the Shaw acquisition, and/or agreed to engage in insider trading based on such information, and made arrangements for sharing the illicit trading profits with Femenia and/or Hegedus.

### The Communications and Insider Trading

251. On July 5, 2012, Femenia and Hegedus had multiple phone calls.

252. On July 6, 2012 at approximately 8:49 a.m., Hegedus called Williams. The call lasted less than one minute.

253. On July 6, 2012 at approximately 9:10 a.m., Williams called Hegedus. The call lasted approximately 13 minutes.

254. On July 6, 2012 at approximately 9:48 a.m., Hegedus and/or Laurenti, through their entities GoldStar P.S. and Coram Real Estate, made their first trades in the securities of Shaw, ultimately purchasing and selling numerous Shaw call options.

255.     On July 6, 2012 at approximately 9:20 a.m., Hegedus called Raby.  The call lasted approximately one minute.

256.     On July 6, 2012 at approximately 10:37 a.m., Raby called Hegedus.  The call lasted approximately 12 minutes.

257.     On July 6, 2012 at approximately 1:28 p.m., Raby made his first trade in the securities of Shaw, ultimately purchasing hundreds of Shaw call options between July 6, 2012 and July 27, 2012.

258.     On July 6, 2012 at approximately 2:02 p.m., Williams made his first trade in the securities of Shaw, ultimately purchasing hundreds of Shaw call options between July 6, 2012 and August 15, 2012.

259.     On July 10, 2012 at approximately 4:28 p.m., Hayes called Williams.  The call lasted approximately five minutes.

260.     On July 11, 2011 at approximately 9:23 a.m., Hayes called Burgess.  The call lasted approximately 29 minutes.

261.     On July 11, 2012 at approximately 10:33 a.m., Hayes called Burgess.  The call lasted less than one minute.

262.     On July 11, 2012 at approximately 3:06 p.m., Hayes made his first trade in the securities of Shaw, ultimately purchasing numerous call options.

263.     On July 12, 2012 at approximately 10:42 a.m., Burgess called Hayes.  The call lasted approximately 9 minutes.

264.     On July 13, 2012 at approximately 9:51 a.m., Burgess made his first trade in the securities of Shaw, ultimately purchasing numerous shares of Shaw and call options between July 13, 2012 and July 26, 2012.

265. During the time periods in which the insider trading occurred, these Defendants exchanged frequent phone calls, including calls often on the same day or the days prior to their trading.

### The Exercise/Sale of Securities and Transfer, Dissipation and Sharing of Profits

266. On July 30, 2012 at approximately 7:41 a.m., CBI and Shaw announced their agreement for CBI to acquire Shaw.

267. On July 30, 2012, at approximately 7:58 a.m., Burgess called Williams for the first of several calls between them that day.

268. On July 30, 2012 at approximately 7:59 a.m., Williams called Hayes for the first of several calls between them that day, including one call lasting approximately 26 minutes.

269. On July 30, 2012 at approximately 8:44 a.m. and again at approximately 10:11 a.m., Femenia called Hegedus.

270. On July 30, 2012 at approximately 9:09 a.m., Williams called Hegedus. The call lasted approximately 7 minutes.

271. On July 30, 2012 at approximately 9:17 a.m., Hegedus called Raby. The call lasted approximately 5 minutes.

272. On July 30, 2012 at approximately 8:50 p.m., Williams called Hayes. The call lasted approximately 26 minutes.

273. On July 30, 2012 at approximately 9:18 p.m., Raby called Williams. The call lasted approximately 41 minutes.

274. On July 30, 2012 at approximately 11:59 a.m., GoldStar P.S. began exercising its Shaw call options and exercised all of them by July 31, 2012.

275.     On July 30, 2012, beginning at approximately 12:03 p.m., Coram Real Estate began exercising its Shaw call options and exercised all of them by July 31, 2012.

276.     On July 31 at approximately 2:14 p.m., Burgess began selling and/or exercising his Shaw securities.

277.     On July 31, 2012 at approximately 3:55 p.m., Williams began exercising his Shaw call options and exercised all of them by August 15, 2012.

278.     On August 1, 2012 at approximately 11:44 a.m., Raby began exercising his Shaw call options and exercised all of them by August 15, 2012.

279.     On August 14, 2012, Hayes began exercising his call options.

280.     As a result of their insider trading, Hegedus and/or Laurenti, through their entities Coram Real Estate and GoldStar P.S., obtained approximately $1,149,000 in illicit profits.

281.     As a result of his insider trading, Williams obtained approximately $2,511,000 in illicit profits.

282.     As a result of his insider trading, Raby obtained approximately $2,555,000 in illicit profits.

283.     As a result of his insider trading, Hayes obtained approximately $98,000 in illicit profits.

284.     As a result of his insider trading, Burgess obtained approximately $78,000 in illicit profits.

285.     On July 30, 2012 at approximately 11:59 a.m., Hegedus and/or Laurenti transferred $150,000 from Gold Star P.S.'s TD Ameritrade brokerage account to a GoldStar P.S. Bank of America account.

286.     On August 1, 2012, Hegedus and/or Laurenti transferred $318,000 from Coram Real Estate's TD Ameritrade brokerage account to a Coram Real Estate TD Bank account.

287.     On August 3, 2012, Williams electronically transferred $500,000 from his TD Ameritrade brokerage account to a SunTrust Bank account owned and/or controlled by him.

288.     On August 9, 2012, following his sale of approximately 75 percent of his Shaw holdings, Raby electronically transferred $500,000 from his brokerage account to a BB&T Bank account owned and/or controlled by him.

289.     On August 13, 2012, Hegedus and/or Laurenti electronically transferred $180,000 from Coram Real Estate's TD Ameritrade brokerage account to Coram Real Estate's TD Bank account.

290.     On August 15, 2012, Hayes obtained a cash disbursement from his brokerage account of $38,000.

291.     On August 16, 2012, Williams electronically transferred $1,200,000 from his TD Ameritrade brokerage account to a SunTrust Bank account owned and/or controlled by him.

292.     On August 16, 2012, the day after he had completed the exercise of all of his Shaw call options, Raby electronically transferred another $500,000 from his brokerage account to a BB&T Bank account owned and/or controlled by him.

293.     On August 24, 2012, Williams electronically transferred $174,325 from his TD Ameritrade brokerage account to a SunTrust Bank account owned and/or controlled by him.

294.     On August 10, 2012, Williams electronically transferred $180,000 from his TD Ameritrade brokerage account to Coram Real Estate's TD Ameritrade brokerage account as payment for the inside information.

295.    Hegedus and Williams provided the inside information to Raby as a personal gift and/or Raby subsequently provided some portion of his illicit profits to Femenia, Hegedus and/or Williams for the inside information.

296.    Williams provided the inside information to Hayes and Burgess as a personal gift and/or Hayes and/or Burgess subsequently provided some portion of their illicit profits to Femenia, Hegedus and/or Williams for the inside information.

### The Femenia/Hegedus-Musante Chain Tips and Trades in Shaw Securities.

297.    Prior to July 9, 2012, none of Matthew Musante, Anthony Musante or Christine Musante had any history of trading in the securities of Shaw.

298.    During the communications set forth below and/or other communications, certain Defendants in the Femenia/Hegedus-Musante Chain tipped material, nonpublic information regarding the Shaw acquisition, agreed to engage in insider trading based on such information, and/or made arrangements for sharing the illicit trading profits with Femenia, Hegedus and/or Matthew Musante.

299.    In the two months prior to his first trading in Shaw, Matthew Musante had multiple telephone calls with Femenia.

300.    On July 5, 2012 at approximately 11:42 p.m., Femenia called Matthew Musante. The call lasted approximately 6 minutes.

301.    On July 6, 2012 at approximately 8:35 p.m., Matthew Musante called Anthony Musante.  The call lasted less than one minute.

302.    On July 6, 2012 at approximately 2:55 p.m., Matthew Musante made his first trade in the securities of Shaw, ultimately purchasing numerous Shaw securities between July 6, 2012 and July 24, 2012.

303. On July 9, 2012 at approximately 9:46 a.m., Anthony Musante made his first trade in the securities of Shaw, ultimately purchasing numerous Shaw securities between July 9, 2012 and July 21, 2012.

304. During the time periods in which the insider trading occurred, these Defendants exchanged frequent phone calls, including calls often on the same days or the days prior to the trading in Shaw securities.

305. On July 30, 2012 at approximately 10:13 a.m. – and following the announcement earlier that morning of CBI's acquisition of Shaw – Anthony Musante began exercising the Shaw call options in his account.

306. On July 30, 2012 at approximately 10:18 a.m., Matthew Musante began exercising his Shaw call options.

307. As a result of his insider trading Matthew Musante obtained approximately $128,000 in illicit profits.

308. As a result of Anthony Musante's insider trading, Anthony Musante and Christine Musante obtained approximately $1,022,000 in illicit profits.

309. On July 31, 2012, Matthew Musante electronically transferred $9,000 out of his brokerage account.

310. From July 31, 2012 to August 23, 2012, Anthony and/or Christine Musante electronically transferred a total of $64,500 from their brokerage account to a TD Bank account owned or controlled by them.

311. From August 7 and August 9, 2012, Anthony and/or Christine Musante electronically transferred a total of $55,000 from their brokerage account to a JP Morgan checking account owned or controlled by Anthony Musante.

312.	Femenia provided the inside information to Matthew Musante as a personal gift and/or Matthew Musante subsequently provided some portion of his illicit profits to Femenia and/or Hegedus in payment for the inside information.

313.	Matthew Musante provided the inside information to Anthony Musante as a personal gift and/or Anthony Musante subsequently provided some portion of his illicit profits to Femenia, Hegedus and/or Matthew Musante.

### Femenia Tips Wens Who Trades on the Inside Information

314.	Prior to July 9, 2012, Wens had no history of trading in the securities of Shaw.

315.	On July 5, 2012 at approximately 9:50 p.m., Femenia called Wens. The call lasted less than one minute.

316.	During these communications and/or other communications, Femenia tipped Wens with material, nonpublic information regarding the Shaw acquisition; and they agreed to engage in insider trading based on such information, and made arrangements for sharing the illicit trading profits with Femenia.

317.	On July 9, 2012, Wens made his first trade in the securities of Shaw, ultimately purchasing thousands of Shaw shares and hundreds of Shaw call options between July 9 and July 13, 2012.

318.	On July 30, 2012 at approximately 11:42 a.m. – and following CBI and Shaw's announcement earlier that morning of CBI's acquisition of Shaw – Wens began selling and/or exercising all of his Shaw securities.

319.	As a result of Wens' insider trading, Wens obtained approximately $235,000 in illicit profits.

320.     From August 1 to August 27, 2012, Wens electronically transferred approximately $52,000 out of the TD Ameritrade brokerage account.

321.     Wens also transferred a portion of his illicit trading profits to Femenia by depositing cash into a Bank of America bank account held in the name of Femenia's girlfriend. That account was controlled by Femenia.

### The Ontario Teachers/SeaCube Transaction

### Background

322.     In or about 2012, Wells Fargo Securities became aware of Ontario Teachers' interest in acquiring SeaCube, and in connection with that possible acquisition, Wells Fargo Securities and/or Wells Fargo Bank N.A. provided or considered providing financing to Ontario Teachers.

323.     Certain Wells Fargo Securities employees became aware of the potential Ontario Teachers-SeaCube transaction as early as September 2012.

324.     Femenia became aware of the potential acquisition of SeaCube as early as September 2012, either in the course of his duties as an employee of Wells Fargo Securities or through the misappropriation of such information from a Wells Fargo Securities colleague and/or confidential documents.

325.     On January 18, 2013 at approximately 7:39 p.m., Ontario Teachers announced that it would acquire SeaCube for $467 million. Pursuant to the terms of the acquisition, SeaCube shareholders would receive $23.00 for each share.

326.     SeaCube's closing share price on the first trading day after the announcement (January 22, 2013) increased by approximately 14 percent over the prior trading day's close (from $20.30 to $23.14).

327.    On or about April 25, 2013, Ontario Teachers finalized its acquisition of

SeaCube, converting all outstanding shares of SeaCube to $23.00 in cash per share.

### The Femenia-Hegedus-Williams Chain Tips, Trades and Profits in Connection with the SeaCube Acquisition.

328.    Prior to September 24, 2012, none of Hegedus, Laurenti, Coram, GoldStar P.S.,

Williams, Raby, Burgess, or Hayes had any history of trading in the securities of SeaCube.

329.    During the communications set forth below and/or other communications, certain

Defendants in the Hegedus-Femenia-Williams Chain tipped material nonpublic information

regarding the SeaCube acquisition, agreed to engage in insider trading based on such

information, and/or made arrangements for sharing the illicit trading profits with Femenia and/or

Hegedus.

330.    On September 19, 2012 at approximately 2:39 p.m., Femenia sent Hegedus a text

message, and at approximately 2:45 p.m., Femenia called Hegedus for a call lasting

approximately seven minutes.

331.    Also on September 19, 2012 at approximately 3:33 p.m. (lasting three minutes),

5:12 p.m. (lasting 25 seconds), 6:24 p.m. (lasting 21 minutes), and 6:56 p.m. (lasting 2 minutes),

Hegedus exchanged phone calls with Raby.  At approximately 8:13 p.m. and 10:47 p.m. on that

same day, Hegedus exchanged text messages with Raby.

332.    On September 22, 2012 at approximately 10:23 p.m., Hegedus called Williams

(lasting 33 seconds).

333.    On September 23, 2012, Hegedus exchanged at least five text messages with

Femenia.

334.    On September 24, 2012 at approximately 12:25 p.m. and 12:26 p.m., Hegedus and

Femenia exchanged text messages.

335.    On September 24, 2012, beginning at approximately 12:31 p.m., Raby placed his first ever trade in SeaCube, purchasing 5,000 shares at $18.60 per share. As set forth in greater detail below, between September 24, 2012 and December 3, 2012, Raby purchased 170,000 shares of SeaCube in his brokerage accounts, at prices ranging between $16.87 and $18.79 per share. Raby spent approximately $3,000,000 to purchase these SeaCube shares.

336.    Later on September 24, 2012, beginning at approximately 12:58 p.m., Hegedus and Femenia continued their text message exchanges from earlier in the day, exchanging at least 10 text messages between approximately 12:58 p.m. and 7:38 p.m.

337.    Also on September 24, 2012, beginning at approximately 3:09 p.m., Williams placed his first ever trade in SeaCube, purchasing 5,000 shares at $18.50 per share. As set forth in greater detail below, between September 24, 2012 and December 3, 2012, Williams purchased 110,000 shares of SeaCube in his brokerage accounts, at prices ranging between $16.86 and $18.80 per share. Williams spent approximately $1,963,000 to purchase these SeaCube shares.

338.    Later on September 24, 2012 at approximately 5:58 p.m., Williams called Hegedus (seven minutes).

339.    On September 25, 2012 at approximately 10:43a.m., Hegedus called Williams (18 seconds), and at approximately 11:01 a.m., Williams called Hegedus (four minutes and 37 seconds).

340.    Later on September 25, 2012, beginning at approximately 11:10 a.m., Williams purchased 5,000 shares of SeaCube.

341.    On or about September 25, 2012, Williams and/or Burgess called, texted, or otherwise communicated with Hayes regarding nonpublic information concerning the possible acquisition of SeaCube.

342.    Beginning at approximately 12:09 p.m. on September 25, 2012, Hayes placed his first ever trade in SeaCube, purchasing 250 shares at $18.82 per share. As set forth in greater detail below, between September 24, 2012 and December 5, 2012, Hayes purchased 3,600 shares of SeaCube in his brokerage accounts, at prices ranging between $16.83 and $18.87 per share. Hayes spent approximately $64,000 to purchase these SeaCube shares.

343.    On or about September 25, 2012, Williams and/or Hayes called, texted, or otherwise communicated with Burgess regarding nonpublic information concerning the possible acquisition of SeaCube.

344.    Beginning at approximately 2:48 p.m. on September 25, 2012, Burgess placed his first ever trade in SeaCube, purchasing 5,000 shares at $18.50 per share. As set forth in greater detail below, between September 25, 2012 and November 29, 2012, Burgess purchased 4,000 shares of SeaCube in his brokerage accounts, at prices ranging between $17.21 and $18.76 per share. On November 27, 2012, Burgess sold 1,000 shares of SeaCube at between $18.30 and $18.32 per share.

345.    On September 26, 2012, beginning at approximately 12:24 p.m., Raby purchased 5,000 shares of SeaCube.

346.    On September 27, 2012, beginning at approximately 10:22 a.m., Hegedus exchanged at least two phone calls with Raby, with such calls lasting approximately 47 seconds, and four minutes.

347.    On October 1, 2012, beginning at approximately 11:48 a.m., Raby purchased 1,200 shares of SeaCube.

348.    Also on October 1, 2012, beginning at approximately 2:51 p.m., Hegedus exchanged at least 20 text messages with Femenia.

349.    Later on October 1, 2012, beginning at approximately 4:00 p.m., Hegedus exchanged at least two phone calls with Raby, with such calls lasting 30 seconds and 22 minutes.

350.    On October 2, 2012 at approximately 9:12 a.m., Hegedus called Raby (four seconds), and at approximately 9:54 a.m., Raby called Hegedus (two minutes).

351.    Later that same morning of October 2, 2012, beginning at approximately 10:25 a.m., Raby purchased 1,800 shares of SeaCube.

352.    Minutes later on October 2, 2013, at approximately 10:28 a.m., Hegedus sent a text message to Williams.  And at approximately 10:39 a.m., Williams called Hegedus (20 minutes).

353.    On October 3, 2012, beginning at approximately 1:10 p.m., Hegedus exchanged at least five text messages with Femenia.

354.    Less than an hour later that same afternoon of October 3, 2012, beginning at approximately 1:47 p.m., Raby purchased 2,000 shares of SeaCube.

355.    Shortly thereafter, beginning at approximately 1:48 p.m., Williams purchased 2,000 shares of SeaCube.

356.    Later that afternoon of October 3, 2012 at approximately 5:11 p.m., Hegedus sent a text message to Raby.

357.    On October 4, 2012, beginning at approximately 9:54 a.m., Raby purchased 500 shares of SeaCube.

358.    Later that morning of October 4, 2012 at approximately 10:58 a.m., Hegedus called Raby (approximately three seconds), and at approximately 11:06 a.m., Raby called Hegedus (six minutes).

359. On October 5, 2012, beginning at approximately 9:45 a.m., Raby purchased 500 shares of SeaCube.

360. On October 9, 2012, beginning at approximately 10:12 a.m., Raby purchased 1,000 shares of SeaCube.

361. On October 9, 2012, beginning at approximately 10:49 a.m., Hegedus exchanged at least nine text messages with Femenia.

362. On October 15, 2012, beginning at approximately 3:55 p.m., Burgess purchased 500 shares of SeaCube.

363. On October 17, 2012, beginning at approximately 11:11 a.m., Williams purchased 8,000 shares of SeaCube.

364. On October 31, 2012, beginning at approximately 3:48 p.m., Burgess purchased 500 shares of SeaCube.

365. On November 1, 2012, beginning at approximately 12:37 p.m., Burgess purchased 200 shares of SeaCube.

366. On November 2, 2012, beginning at approximately 10:01 a.m., Hayes purchased 250 shares of SeaCube.

367. On November 8, 2012, beginning at approximately 2:46 p.m., Burgess purchased 1,500 shares of SeaCube.

368. On November 8, 2012, beginning at approximately 4:54 p.m., Hegedus exchanged at least 12 text messages with Femenia. At approximately 10:18 p.m. that evening, Femenia called Hegedus for a call lasting approximately 23 minutes.

369. On November 9, 2012, beginning at approximately 2:26 p.m., Raby purchased 8,000 shares of SeaCube.

370.     On November 11, 2012 at approximately 1:20 p.m., Williams called Hegedus (25 minutes).

371.     Later that afternoon of November 11, 2012, Femenia called Hegedus at approximately 2:57 p.m. (17 minutes) and 3:18 p.m. (12 minutes).

372.     On November 12, 2012 at approximately 12:26 a.m., Femenia and Hegedus exchanged a text message.

373.     Later that morning of November 12, 2012, at approximately 10:53 a.m., with no prior trading history in SeaCube, Hegedus and/or Laurenti through their brokerage account of GoldStar P.S. began purchasing out-of-the-money SeaCube call options.  Between November 12, 2012 and December 3, 2012, Hegedus and/or Laurenti through their brokerage account of GoldStar P.S. purchased the following SeaCube call options:  (a) 104 December 2012 call options with a strike price of $17.50; (b) 108 January 2013 call options with a strike price of $20.00; (c) 71 January 2013 call options with a strike price of $20.00; and (d) 470 February 2013 call options with a strike price of $17.50.  Hegedus and/or Laurenti spent approximately $65,000 to purchase these call options.

374.     Later on the afternoon of November 12, 2012, at approximately 12:13 p.m., Hegedus called Raby (approximately 30 seconds), and at approximately 2:58 p.m., Raby called Hegedus (14 minutes).

375.     Also on November 12, 2012, Femenia and Hegedus exchanged text messages at approximately 12: 14 p.m. and 12:15 p.m.

376.     On the same afternoon of November 12, 2012, Williams purchased 30,000 shares of SeaCube (beginning at approximately 12:23 p.m.), and Raby purchased 30,000 shares of SeaCube (beginning at approximately 3:44 p.m.).

377. On November 13, 2012, beginning at approximately 10:13 a.m., Williams purchased 5,000 shares of SeaCube.

378. Later that morning of November 13, 2012, beginning at approximately 11:03 a.m., Hayes purchased 1,000 shares of SeaCube.

379. On the afternoon of November 13, 2012, at approximately 3:51 p.m., Hegedus called Raby (three minutes and 38 seconds). Minutes later, beginning at approximately 3:53 p.m., Raby purchased 22,000 shares of SeaCube.

380. Also on November 13, 2012, beginning at approximately 4:59 p.m., Hegedus exchanged at least 10 text messages with Femenia.

381. On November 14, 2012, beginning at approximately 10:09 a.m., the brokerage account of GoldStar P.S. purchased the following SeaCube call options: (a) 45 December 2012 call options with a strike price of $17.50; and (b) 50 February 2013 call options with a strike price of $17.50.

382. Later that same afternoon of November 14, 2012, beginning at approximately 2:17 p.m., Raby purchased 25,000 shares of SeaCube.

383. That same day, beginning at approximately 3:39 p.m., Hegedus exchanged at least eight text messages with Femenia.

384. On November 15, 2012, Hayes purchased 500 shares of SeaCube (beginning at approximately 2:53 p.m.), Raby purchased 1,000 shares of SeaCube (beginning at approximately 3:04 p.m.), and Williams purchased 6,684 shares of SeaCube (beginning at approximately 3:27 p.m.).

385. On November 16, 2012, beginning at approximately 12:59 p.m., the brokerage account of GoldStar P.S. purchased the following SeaCube call options: (a) 59 December 2012

call options with a strike price of $17.50; and (b) 31 February 2013 call options with a strike price of $17.50.

386.    Also on November 16, 2012, beginning at approximately 1:11 p.m., Williams purchased 4,256 shares of SeaCube. And beginning at approximately 1:33 p.m., Raby purchased 10,000 shares of SeaCube.

387.    Later in the afternoon and evening of November 16, 2012, beginning at approximately 3:59 p.m., Hegedus exchanged at least 15 text messages with Femenia.

388.    On November 19, 2012, beginning at approximately 9:45 a.m., Raby purchased 11,000 shares of SeaCube.

389.    Also on November 19, 2012, beginning at approximately 12:59 p.m., Hegedus exchanged at least 12 text messages with Femenia.

390.    Later in the afternoon of November 19, 2012, beginning at approximately 3:25 p.m., Williams purchased 4,185 shares of SeaCube.

391.    Still later in the afternoon of November 19, 2012, at approximately 4:36 p.m., Hegedus called Raby (42 seconds), and at approximately 4:41 p.m., Raby called Hegedus (seven minutes). And at approximately 6:03 p.m., Williams called Hegedus (41 minutes).

392.    On November 20, 2012, Hayes purchased 500 shares of SeaCube (beginning at approximately 12:23 p.m.), and Williams purchased 1,520 shares of SeaCube (beginning at approximately 2:07 p.m.).

393.    On November 21, 2012, beginning at approximately 7:35 a.m., Hegedus exchanged at least 8 text messages with Femenia.

394.    Later during the morning of November 21, 2012, beginning at approximately 10:24 a.m., Williams purchased 3,355 shares of SeaCube.

395.    On the afternoon of November 21, 2012, beginning at approximately 12:52 p.m., Raby purchased 7,159 shares of SeaCube.

396.    Later on that same afternoon of November 21, 2013, at approximately 4:23 p.m., Hegedus called Williams (21 minutes).  And beginning at approximately 4:52 p.m., Hegedus exchanged at least four text messages with Williams.

397.    On November 23, 2012, beginning at approximately 11:11 a.m., Raby purchased 7,841 shares of SeaCube.

398.    On November 26, 2012, beginning at approximately 10:08 a.m., Raby purchased 200 shares of SeaCube.

399.    On November 27, 2012, beginning at approximately 9:36 a.m., Hayes purchased 1,000 shares of SeaCube.

400.    Later that same day, beginning at approximately 1:40 p.m., Burgess sold 1,000 shares of SeaCube at between $18.30 and $18.32 per share.

401.    On November 28, 2012, beginning at approximately 1:34 a.m., Hegedus exchanged at least 20 text messages with Femenia.

402.    Later that day, beginning at approximately 3:48 p.m., Hegedus and/or Laurenti through their brokerage account of GoldStar P.S. purchased 82 SeaCube January 2013 call options with a strike price of $17.50.

403.    Minutes later, beginning at approximately 3:52 p.m., Raby purchased 10,744 shares of SeaCube.

404.    On November 29, 2012, beginning at approximately 11:42 a.m., Hegedus exchanged at least three text messages with Femenia.

405.    Minutes later on November 29, 2012, beginning at approximately 12:02 p.m., Williams purchased 10,000 shares of SeaCube. Two minutes later, at approximately 12:04 p.m., Hegedus called Williams (five minutes).

406.    Less than 20 minutes later, beginning at approximately 12:21 p.m., Raby purchased 896 shares of SeaCube.

407.    Later that same afternoon of November 29, 2012, beginning at approximately 3:56 p.m., Burgess purchased 300 shares of SeaCube.

408.    On November 30, 2012, beginning at approximately 10:10 a.m., Raby purchased 3,160 shares of SeaCube.

409.    Later that same day (November 30, 2012), beginning at approximately 12:31 p.m., the brokerage account of GoldStar P.S. purchased 26 SeaCube January 2013 call options with a strike price of $17.50.

410.    On December 3, 2012, beginning at 12:11 p.m., Hegedus exchanged at least 15 text messages with Femenia. That same day, beginning at approximately 1:30 p.m., the brokerage account of GoldStar P.S. purchased 74 SeaCube January 2013 call options with a strike price of $20.00.

411.    Also, on December 3, 2012 at 1:47 p.m., Hegedus called Williams (2 minutes), and beginning at approximately 1:59 p.m., Williams purchased 10,000 shares of SeaCube.

412.    Later that same afternoon of December 3, 2012, beginning at approximately 3:40 p.m., Raby purchased 15,000 shares of SeaCube.

413.    On December 5, 2012, beginning at approximately 10:58 a.m., Hayes purchased 100 shares of SeaCube.

414. As of December 5, 2012, Hegedus and/or Laurenti through the GoldStar P.S. brokerage account held 470 February 2013 SeaCube call Options with a strike price of $17.50, 108 January 2013 SeaCube call options with a strike price of $17.50, and 71 January 2013 SeaCube call options with a strike price of $20.00.

415. As of December 5, 2012, Williams' brokerage account held 110,000 shares of SeaCube.

416. As of December 5 2012, Raby's brokerage accounts held 170,000 shares of SeaCube.

417. As of December 5, 2012, Hayes's brokerage account held 3,600 shares of SeaCube.

418. As of December 5, 2012, Burgess' brokerage account held 3,000 shares of SeaCube.

419. On January 18, 2013, at approximately 7:39 p.m., Ontario Teachers announced that it would acquire SeaCube for $23.00 per share.

420. On January 22, 2013, the first trading day after the announcement, SeaCube's closing share price increased by approximately 14 percent over the prior trading day's close (from $20.30 to $23.14).

421. On April 25, 2013, as part of Ontario Teachers' acquisition of SeaCube, Ontario Teachers' paid SeaCube shareholders $23 for each outstanding share of SeaCube stock..

422. As a result of the insider trading in SeaCube by Hegedus and/or Laurenti through GoldStar P.S., GoldStar P.S. made approximately $220,000 in illicit profits.

423. As a result of his insider trading in SeaCube, Williams made approximately $567,000 in illicit profits.

424. As a result of his insider trading in SeaCube, Raby made approximately $896,000 in illicit profits.

425. As a result of his insider trading in SeaCube, Hayes made approximately $19,000 in illicit profits.

426. As a result of his insider trading in SeaCube, Burgess made approximately $15,000 in illicit profits.

427. Hegedus provided the inside information concerning SeaCube to Williams as a personal gift and/or Williams subsequently provided some portion of his illicit profits to Femenia and/or Williams.

428. Hegedus and/or Williams provided the inside information concerning SeaCube to Raby as a personal gift and/or Raby subsequently provided some portion of his illicit profits to Hegedus and/or Williams.

429. Williams and/or Burgess and/or Hayes provided the inside information concerning SeaCube to Burgess and/or Hayes as a personal gift and/or Burgess and/or Hayes subsequently provided some portion of the illicit profits to Williams and/or Burgess and/or Hayes.

**The Femenia/Hegedus-Musante Chain Tips, Trades and Profits in Connection with the SeaCube Acquisition.**

430. Prior to November 19, 2012, none of Matthew Musante, Anthony Musante or Christine Musante had any history of trading in the securities of SeaCube.

431. During the communications set forth below and/or other communications, certain Defendants in the Femenia/Hegedus-Musante Chain tipped material, nonpublic information regarding the SeaCube acquisition, agreed to engage in insider trading based on such

information, and/or made arrangements for the sharing of the illicit trading profits with Femenia and/or Matthew Musante.

432.    On November 18, 2012, Matthew Musante exchanged at least four text messages with Femenia.

433.    On November 19, 2012, beginning at approximately 9:48 a.m., Matthew Musante placed his first ever trade in SeaCube, purchasing 78 February 2013 call options with a strike price of $17.50, and 250 February 2013 call options with a strike price of $20.00.  On November 19, 2012, SeaCube's opening share price was $17.29 per share.  Between November 19, 2012 and December 5, 2012, Matthew Musante purchased 1,300 February 2013 call options in SeaCube with a strike price of $20.00 and 150 February 2013 call options with a strike price of $17.50.

434.    On November 19, 2012, beginning at approximately 11:27 a.m., Matthew Musante exchanged at least 11 text messages with Femenia.

435.    On November 20, 2012, beginning at approximately 12:13 a.m., Matthew Musante exchanged at least 19 text messages with Femenia.

436.    Later that same morning of November 20, 2012, beginning at approximately 10:32 a.m., Matthew Musante purchased February 2013 call options in SeaCube with strike prices of $20.00 (200 calls bought) and $17.50 (22 calls bought).

437.    On the afternoon of November 20, 2012, at approximately 4:11 p.m., Matthew Musante called Anthony Musante (11 minutes).

438.    On November 21, 2012, beginning at approximately 9:51 a.m., Matthew Musante purchased February 2013 call options in SeaCube with strike prices of $20.00 (100 calls bought) and $17.50 (50 calls bought).

Case 3:12-cv-00803-GCM   Document 107   Filed 05/22/13   Page 58 of 66

439.    Beginning at approximately 11:44 a.m. on that same day, Matthew Musante exchanged at least 13 text messages with Femenia.

440.    Later that same afternoon (of November 21, 2012), beginning at approximately 12:33 p.m., Anthony Musante made his first ever trade in the securities of SeaCube in the TD Ameritrade account jointly held by Anthony and Christine Musante, with 1,000 shares being purchased at $17.63 per share.

441.    Between November 21, 2012 and December 5, 2012,  Anthony Musante bought and sold 1,000 shares of SeaCube and 100 February 2013 call options were purchased with a strike price of $17.50.

442.    Later that same evening, at approximately 8:40 p.m., Matthew Musante called Anthony Musante (eight minutes and 30 seconds).

443.    On November 22, 2012, at approximately 1:59 p.m. and again at 6:50 p.m., Matthew Musante exchanged text messages with Femenia.

444.    On November 23, 2012, beginning at approximately 9:43 a.m., Matthew Musante purchased 18 February 2013 call options in SeaCube with a strike price of $20.00.

445.    On November 26, 2012, beginning at approximately 12:13 p.m., Matthew Musante purchased 32 February 2013 call options in SeaCube with a strike price of $20.00.

446.    On November 27, 2012, beginning at approximately 11:31 a.m., Matthew Musante purchased 62 February 2013 call options in SeaCube with a strike price of $20.00.

447.    On November 28, 2012, beginning at approximately 10:45 a.m., Matthew Musante purchased 138 February 2013 call options in SeaCube with a strike price of $20.00.

448.    On November 29, 2012, beginning at approximately 10:29 a.m., Matthew Musante purchased 89 February 2013 call options in SeaCube with a strike price of $20.00.

449.    On November 30, 2012, beginning at approximately10:52 a.m., Matthew Musante purchased 111 February 2013 call options in SeaCube with a strike price of $20.00.

450.    Later that same evening (November 30, 2012), beginning at approximately 6:33 p.m., Matthew Musante exchanged at least three text messages with Femenia.

451.    On December 2, 2012, beginning at approximately 2:07 a.m., Matthew Musante exchanged at least nine text messages with Femenia.  At approximately 11:07 a.m., Musante called Femenia for a call lasting approximately 1 minute and 27 seconds.

452.    On December 3, 2012, beginning at approximately 10:32 a.m., Matthew Musante purchased 88 February 2013 call options in SeaCube with a strike price of $20.00.

453.    On December 4, 2012, beginning at approximately 9:46 a.m., Matthew Musante purchased 98 February 2013 call options in SeaCube with a strike price of $20.00.

454.    On December 5, 2012, beginning at approximately 10:09 a.m., Matthew Musante purchased 114 February 2013 call options in SeaCube with a strike price of $20.00.

455.    Less than one hour later, beginning at approximately 10:53 a.m., Anthony Musante purchased 100 February 2013 call options in SeaCube with a strike price of $17.50.  In addition, 1,000 shares of SeaCube were sold in this account at $18.16 per share.

456.    Matthew Musante spent approximately $80,000 to purchase SeaCube call options.

457.    Approximately $33,000 was spent to purchase the SeaCube shares and call options in the brokerage account jointly held by Anthony and Christine Musante.

458.    As of December 5, 2012, Matthew Musante's brokerage account held 1,300 SeaCube February 2013 call options with a strike price of $20.00 and 150 SeaCube February 2013 call options with a strike price of $17.50.

459.     As of December 5, 2012, the brokerage account of Anthony and Christine Musante held 100 February call options with a strike price of $17.50.

460.     On January 18, 2013, at approximately 7:39 p.m., Ontario Teachers announced that it would acquire SeaCube.

461.     On January 22, 2013, the first trading day after the announcement, SeaCube's closing share price increased by approximately 14 percent over the prior trading day's close (from $20.30 to $23.14).

462.     On February 15, 2013, the SeaCube options in Matthew Musante's account were sold resulting in illicit profits of approximately $384,000.

463.     On February 15, 2013, the SeaCube options in Anthony and Christine Musante's account were sold resulting in illicit profits of approximately $38,000.

464.     Femenia provided the inside information to Matthew Musante as a personal gift and/or Matthew Musante subsequently provided some portion of his illicit profits to Femenia Hegedus in payment for the inside information.

465.     Matthew Musante provided the inside information to Anthony Musante as a personal gift and/or Anthony Musante subsequently provided some portion of his illicit profits to Hegedus and/or Matthew Musante.

### COUNT I
**Violations of Section 10(b) of the Exchange Act [15. U.S.C.
§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

**(Against Defendants Femenia, Hegedus, Laurenti, Coram Real Estate, GoldStar P.S.,
Williams, Raby, Burgess, Hayes, Matthew Musante, Anthony Musante and Wens)**

466.     Paragraphs 1 through 465 are hereby realleged and are incorporated herein by reference.

467.    As described above, Defendants Femenia, Hegedus, Laurenti, Coram Real Estate, GoldStar P.S., Williams, Raby, Burgess, Hayes, Matthew Musante, Anthony Musante and Wens engaged in an illegal insider trading scheme in which each possessed and used material, nonpublic information which they knew, should have known, or were reckless in not knowing was obtained in breach of a duty of trust or confidence and/or tipped others who used that material, nonpublic information to purchase or sell securities.

468.    By their conduct described above, the Defendants, in connection with the purchase and sale of securities, by the use of any means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly and indirectly:

    (a)    employed devices, schemes, and artifices to defraud;

    (b)    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (c)    engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers of the securities.

469.    The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, the Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

470.     By reason of the foregoing, the Defendants, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### (Against Relief Defendants Christine Musante and Lack)

471.     Paragraphs 1 through 470 are realleged and incorporated by reference herein.

472.     Relief Defendants Christine Musante and Lack obtained and/or had accrued in their accounts the funds and property alleged above as part of and in furtherance of the securities violations alleged above and under circumstances in which it is not just, equitable or conscionable for them to retain the illicit profits

## PRAYER FOR RELIEF

WHEREFORE, the Commission, respectfully prays that the Court:

### I.

Make findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure finding that Defendants committed the violations alleged herein.

### II.

Issue a permanent injunction enjoining Defendants Femenia, Hegedus, Laurenti, Coram Real Estate, GoldStar P.S., Williams, Raby, Burgess, Hayes, Matthew Musante, Anthony Musante and Wens, directly or indirectly, and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, and each of them from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

III.

Issue an Order requiring, on a joint and several basis, the disgorgement by Defendants Femenia, Hegedus, Laurenti, Coram Real Estate, GoldStar P.S., Williams, Raby, Burgess, Hayes, Matthew Musante, Anthony Musante and Wens of illicit trading profits or other ill-gotten gains made as a result of the conduct alleged in this Complaint, with prejudgment interest.

IV.

Issue an Order requiring the Relief Defendants Christine Musante and Lack to disgorge all unjust enrichment or other ill-gotten gains received as a result of the conduct alleged in this Complaint, with prejudgment interest.

V.

Issue an Order requiring Defendants Femenia, Hegedus, Laurenti, Coram Real Estate, GoldStar P.S., Williams, Raby, Burgess, Hayes, Matthew Musante, Anthony Musante and Wens, pursuant to Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1], to pay civil monetary penalties.

VI.

Continue all the relief previously provided for in the Court's Orders entered in this Action, including but not limited to the preliminary injunctive relief and asset freeze, as such asset freeze has been amended by the Court.

## VI.

Grant such other and further relief as the Court deems just and appropriate.

Dated: May 22, 2013

RESPECTFULLY SUBMITTED,

Paul T. Kim
Senior Trial Counsel
Georgia Bar No. 418841
kimpau@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Pat Huddleston II
Senior Trial Counsel
Georgia Bar No. 373984
huddlestonp@sec.gov

COUNSEL FOR PLAINTIFF
U.S. SECURITIES AND EXCHANGE COMMISSION
Atlanta Regional Office
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, Georgia 30326-1382
Tel: (404) 842-7600
Fax: (404) 842-7633

65

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of this Court using the CM/ECF system, which will send notice of such filing to counsel of the record.

Dated: May 22, 2013

<u>/s/ Paul Kim</u>
Paul Kim